1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8   BARON M COWAN,                        No  C 07-1136 VRW
9               Plaintiff                 ORDER
10
11                   v
12  MICHAEL J ASTRUE,
    Commissioner of Social Security,
13
14              Defendant.
    _____/
15
16          Plaintiff Baron Michael Cowan brings this action under 42
17  USC section 405(g), challenging the final decision of the Social
18  Security Administration (SSA) denying his application for
19  supplemental security income (SSI) and disability insurance
20  benefits (DIB).  The parties have filed cross-motions for summary
21  judgment.  Docs #12, #14.  For the reasons stated herein, the court
22  DENIES plaintiff's motion and GRANTS defendant's motion.
23
24                              I
25          Plaintiff was born on July 6, 1953.  In the Navy during
26  the Vietnam War, plaintiff worked on an aircraft carrier in a non-
27  combat position; his service ended with a general discharge under
28  honorable conditions.  AR 372-73.  Plaintiff completed two years of

United States District Court
For the Northern District of California

college, receiving an Associate of Arts degree, as well as
vocational training as a beautician.  AR 96.  His work history
includes experience as a hairdresser, auto repair person and
salesperson.  AR 73-77.  His self-reported criminal history consists
of one year in prison in the 1980's for selling drugs.  AR 272, 348.
Plaintiff alleges that he has been unable to work since
October 1, 2001 due to carpal tunnel syndrome, brittle diabetes
mellitus, post-traumatic stress disorder (PTSD), anxiety and major
depression.  AR 351.

A

        The discussion of medical records will first review
records discussing physical ailments, followed by those relating to
mental impairments together with the substance abuse issues that are
prominent in plaintiff's medical history.

        Dr Queelan Ratnesar, MD, treated plaintiff between March
of 2001 and February of 2003 for arm pain, diabetes and
hypertension.  AR 204-18.  In February 2003, Dr Ratnesar declined to
refill plaintiff's Vicodin prescription, written to alleviate pain
associated with carpal tunnel syndrome, due to concern that
plaintiff was abusing the medication.  AR 205.  In November of 2003,
neurology tests at the Veteran's Administration (VA) Hospital
revealed "neuropathies at the wrist compatible with carpal tunnel
syndrome, moderate on the right, very mild on the left."  AR 266.

        In December of 2003, internal medicine specialist Dr C E
Gable, MD, saw plaintiff for a consultative evaluation in connection
with his application for disability benefits.  AR 219-22.  Dr Gable
noted that plaintiff had brought no records and described him as a

2

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

"nebulous historian" who claimed to suffer from "out of control" diabetes, carpal tunnel syndrome and a "long history of mental disorder" encompassing depression, PTSD and anxiety.  Dr Gable described plaintiff as "well-developed, well-nourished, modestly overweight," "pleasant and alert and in no acute distress."  AR 220. He found normal range of motion in all of plaintiff's joints and that "[h]e actually had a good grip, although originally he told me he could not make a fist.  He filled out his form without difficulty."  Under "impression" Dr Gable wrote, <u>inter alia</u>, "carpal tunnel syndrome.  I was not impressed with the findings or the symptoms.  I doubt seriously that he has carpal tunnel syndrome * * *," and, regarding the stated mental illnesses:  "he does not appear particularly depressed and it is noted that he has never been hospitalized."  AR 221.  Regarding self-reported methamphetamine use, Dr Gable noted:  "[h]e states that he used methamphetamine for three years, but not for 10 or 15 years."  Dr Gable concluded that plaintiff could sit, stand and/or walk for six hours per day, lift twenty-five pounds frequently and forty pounds occasionally and had no fine finger or hand limitations.  AR 222.

Notwithstanding Dr Gable's doubts, in July of 2004 plaintiff underwent right carpal tunnel release surgery at the VA Hospital.  AR 308, 311-27, 337-39, 340.

After plaintiff complained of blurred vision and foot pain possibly related to diabetes, he was referred for further evaluations that led to no abnormal findings.  An eye exam by optometrist Dr Andrew Mick at the VA Hospital in May 2004 revealed no diabetic retinopathy.  AR 257.  In October 2004, Dr Jason Reingold referred plaintiff to podiatry to investigate foot pain

3

possibly related to neuropathy.  AR 329-30.  The record contains no further medical evidence regarding these complaints.

Turning to the medical evidence concerning mental impairments, in 2001, Dr Ratnesar noted situational depression, and in 2002 he noted anxiety.  AR 206, 212, 208-10.  Psychiatrist Dr John Engers, MD of the Bay Valley Medical Group in Hayward, California met with plaintiff on two occasions in 2002 under circumstances not clear from the record.  Dr Engers' handwritten notes in the record comment that plaintiff was anxious and depressed, concerned about his worker's compensation case and his relationships with family members who had "basically disowned" him. AR 202-03, 223-25.

In October of 2003, plaintiff saw VA psychiatrist Dr Kimberly Indermaur, MD on referral from his primary VA physician Dr Andrew Klein, MD for evaluation due to "numerous psychosocial stressors."  AR 270.  Plaintiff told her that he had used speed daily in the mid-to-late 1980's, but had not taken amphetamines for "over fifteen years."  AR 272.  He denied drinking alcohol, but reported taking "one shot" the week before, which he told the doctor was his first drink in over twenty years and taking marijuana the night before "to help with sleep."  AR 271.  Dr Indermaur described plaintiff as "cooperative though guarded at times, fidgety, sense of being a performer" and noted that he had "little insight as to how he might contribute to situation or how he might act as agent in changing psychosocial stressors."  AR 273.  Dr Indermaur deferred attempting a diagnosis, commenting that a number of possibilities could explain plaintiff's anxiety and mild depression, including amphetamine use or withdrawal from benzodiazepines (present in one

United States District Court

For the Northern District of California

4

United States District Court

For the Northern District of California

of plaintiff's prescription medications —— diazepam, e g Valium ——
which he claimed to have used up).  Id.

Dr Indermaur ordered a urine toxicology screen "to
evaluate substance abuse."  Id.  Plaintiff tested positive for
amphetamines, cannabinoids and benzodiazepines, prompting Dr
Indermaur to leave plaintiff a message referring him for treatment.
AR 253, 274.  Dr Indermaur noted in plaintiff's file that "[t]hese
substances are known to affect mood and anxiety, primary complaints
of this [patient]."  AR 274.

During a subsequent appointment in November 2003, when Dr
Indermaur asked plaintiff about the urine test results, he told her
that he had only used amphetamines twice, "once the day before our
interview in October and then 2 days ago."  AR 267.  Plaintiff also
asserted that he was not taking his prescribed Valium, but instead
giving it away to friends, whereupon Dr Indermaur discontinued
plaintiff's prescription for diazepam.  She told plaintiff that he
could not begin therapy until he had been substance-free for six-to-
nine months and recommended substance abuse treatment.  Plaintiff
refused to listen to a description of the treatment program and
exclaimed:  "I don't want to hear it.  Why are you accusing me of
being an addict?  I only use speed for the pain!"  AR 267.  Dr
Indermaur reported that the consultation "eventually degenerated to
series of illogical arguments by [patient] to explain why he used
amphetamine, why he needed therapy and why the VA was obligated to
provide this for him."  Id.  Dr Indermaur wrote that plaintiff's
psychological symptoms were "likely exacerbated and/or caused by
substance abuse."  AR 268.

\\

United States District Court

For the Northern District of California

1    In December of 2003, plaintiff underwent a consultative
2  psychological examination performed by Dr Vicky Campagna, Ph D,
3  Clinical Psychologist, at the request of the SSA.  AR 227-33.  Dr
4  Campagna ran a full battery of tests aimed at evaluating plaintiff's
5  mental and psychological RFC, including the Bender-Gestalt, designed
6  to assess visual and motor skills, the Wechsler Adult Intelligence
7  Scale II and the Wechsler Memory Scale III.  AR 227.  Dr Campagna
8  reported IQ scores in the "low average" or, per the administrative
9  law judge (ALJ), "mentally retarded" range of intelligence but found
10  him "able to follow simple two and three-part instructions" but
11  unable to handle complex tasks.  AR 23, 229, 231.  Dr Campagna
12  diagnosed plaintiff with bipolar disorder II (a form of bipolar
13  disorder characterized by milder hypomanic episodes and without
14  psychosis), but concluded that plaintiff's ability to get along with
15  others and to function in a work-related setting were not impaired.
16  AR 230-31.

17    Dr Campagna noted plaintiff's past arrest for drug
18  possession, but assessed his "habits" as "non-contributory,"
19  possibly based on plaintiff's report to her that he had not used
20  methamphetamine for the previous six months (a statement manifestly
21  inconsistent with plaintiff's statements to Dr Indermaur in the two
22  preceding months).  AR 228.  She found him competent to manage
23  funds.  AR 230.

24    In January 2004, plaintiff saw Dr Klein at the VA Hospital
25  for a physical.  Plaintiff told Dr Klein that he had been using
26  speed to treat pain caused by carpal tunnel syndrome.  AR 262.  Dr
27  Klein prescribed Vicodin, a narcotic-and-acetaminophen combination,
28  at the rate of ninety per month for "pain control given

United States District Court
For the Northern District of California

documentation of his [carpal tunnel syndrome]" and decreased

plaintiff's prescription for diazepam.  Id.  Plaintiff expressed

unwillingness to see Dr Indermaur again for psychiatry.  Id.

On October 18, 2004, VA physician Dr Reingold referred

plaintiff to psychiatry, noting that he was extremely anxious and

that he "was initially in a psych program but had a positive utox

screen last year."  AR 305.  On November 5, 2004, plaintiff saw

psychiatrist Dr Winston Chung for an assessment at which he admitted

to using marijuana once per month but denied amphetamine use

explaining that he lacked funds to pay for it, stating his last use

to be July 2004. AR 301.  Dr Chung recorded plaintiff's subjective

complaints as primarily insomnia with episodes of feeling "'down,'

hopeless, irritable and easily agitated."  Id.  Dr Chung assessed

plaintiff as a "51 y/o male [with] chronic insomnia and difficulty

with a low threshold for irritability and emotional dysregulation in

relation to psychosocial stressors, leading to agitated or

amotivational states while not fulfilling criteria for depression or

generalized anxiety [disorder]."  AR 302.  Plaintiff failed to give

urine that day for a toxicology screen "as required for assessment

and treatment" following his appointment with Dr Chung.  AR 303.  In

December 2004, plaintiff again failed to comply with drug testing so

Dr Chang referred him to the substance addiction program.  AR 300.

In August 2005, after his hearing before the ALJ,

plaintiff underwent a post-hearing consultative psychological

examination with psychologist Dr Laura Levine, Ph D, AR 345-50,

after plaintiff's attorney argued to the ALJ that the administrative

record required an additional assessment of plaintiff's mental state

because Dr Campagna had tested cognitive functioning but had not

**United States District Court**
For the Northern District of California

administered tests which would reveal personality or anxiety
disorders.  AR 395-98, 407-08.

Dr Levine administered the Minnesota Multiphasic
Personality Inventory, Thematic Apperception Test and Rorschak
Psychodiagnostik test.  AR 346.  Dr Levine's report described
plaintiff as "anxious with a dysphoric substrate, mood constricted,
manner cooperative but agitated, moderately hypervigilant,
histrionic regarding his psychiatric symptoms, self-pitying and
consciously manipulative" and "an inconsistent and self-serving
historian."  AR 346.  Dr Levine also noted a "poseur quality" which
she explained as the "sense of being a performer."  AR 348.
Regarding substance abuse, plaintiff told Dr Levine that he had used
methamphetamine from age fifteen until quitting "cold turkey" one
year prior to their meeting.  AR 347.  Dr Levine apparently believed
this assertion because she diagnosed plaintiff, inter alia, with
amphetamine abuse "in remission."  AR 350.  Plaintiff also related
that he had a prescription for cannabis for his pain but could not
afford to buy it.  Id.  He admitted to Dr Levine that the reason he
was unable to obtain psychiatric services at the VA was that he
"wouldn't stop using drugs."  AR 348.  Dr Levine concluded that
plaintiff suffered from a "non-specific anxiety disorder compounded
by a longstanding dysthymic disorder, somatic traits, and a mixed
personality disorder characterized by borderline, paranoid,
histrionic and antisocial traits."  AR 350.  Dr Levine concluded
that the "constellation of symptoms and difficulties" described
"significantly impair[ed]" plaintiff's ability to function
"effectively or even normatively at home, within the larger social
environment, or in an employment setting."  Id.  She also wrote that

8

plaintiff's "affective fragility anxiety, dysphoria, paranoia and mood instability, coupled with feelings of helplessness/hopelessness and a multifaceted personality disorder" precluded employment "at this time or for the next twelve months" and noted that plaintiff's history of drug abuse made self-management of funds inadvisable. Id.

B

On July 22, 2003, plaintiff filed applications with the SSA for SSI and DIB alleging disability since October 1, 2001 due to "post-traumatic stress disorder, anxiety, major depression, carpal tunnel, brittle diabetes impairment." AR 69-72, 89-98, 351-54. Plaintiff was referred for the above-described physical and mental evaluations with Drs Gable and Campagna, whose reports were sent to the agency for review in connection with plaintiff's applications.

In January of 2004, agency physician Dr Lyle Yates, MD, completed a consultative physical residual functional capacity (RFC) assessment and found plaintiff capable of the full range of activities at a medium level of exertion. AR 289. Dr Yates concluded that plaintiff could lift or carry forty pounds occasionally and twenty-five pounds frequently, and could sit or stand for six hours. Id.

In February 2004, agency physician Dr Craig Smith completed the SSA's Psychiatric Review Technique form to evaluate plaintiff's eligibility. Considering the impact of "affective disorders" on plaintiff's mental RFC, Dr Smith checked boxes marking plaintiff's degree of limitation "mild" for "restriction of activities of daily living" and "maintaining concentration,

persistence or pace" and moderate for "maintaining social functioning."  AR 244.  He found insufficient evidence to rate "episodes of decompensation."  Id.

On February 20, 2004, the SSA sent notification that plaintiff did not qualify for SSI or DIB.  AR 32-35.  After the SSA denied plaintiff's request for reconsideration, he requested a hearing before an ALJ.  AR 39-50.

At the July 25, 2005 hearing, plaintiff, represented by his counsel Harvey Sackett, described his alleged disabilities.  AR 361-409.  He testified that he only left his rented room if he "necessarily [had] to," AR 368, because his "mind's not right" and his "explosive" temper made him "scared to death to go out, out into the public."  AR 371.  After listening to plaintiff's testimony about his inability to deal with people, the ALJ asked him if he would consider a job such as "the proverbial night janitor who goes into a building and really nobody [is] there."  AR 376.  Plaintiff responded that he did not think he could work as a night janitor but, even though pressed to explain why not, did not give a reason.

The ALJ asked about the PTSD, to which plaintiff's attorney responded "I haven't gotten my hands around that," noting that he had not included reference to PTSD in his pre-hearing brief.  AR 366-67.

Making no reference to the VA's decision to discontinue his psychiatric services, plaintiff testified that "for the last two years, I've tried to get psychiatrist help there and they, they flat-out refused," asserting that he had done "everything they told [him] to do."  AR 370-71, 381.  (The VA's records, meanwhile, reflect that, in addition to missing required drug tests, plaintiff

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

failed to appear for appointments in December 2004 and in May and June 2005.  AR 299-300.)

Plaintiff testified that he could use his hands "continuous" for three or four hours before experiencing "unbearable" pain attributable to carpal tunnel syndrome, after which his hands would be painful for two or three days; he also testified that the July 2004 surgery had not alleviated the pain in his hands "at all."  AR 383-84.

Plaintiff testified that he was not insulin-dependent and was not receiving medical care for his diabetes.  AR 382-88.

Regarding drug and alcohol use, plaintiff testified that he did not use any hard drugs "now," had a prescription for marijuana to treat stress and pain and had not used "street drugs" for the eight months to one year "at least" preceding the hearing. AR 378-82.  Plaintiff denied using alcohol; when the ALJ pointed to a medical report from Dr Indermaur noting recent alcohol use, plaintiff expressed surprise and insisted that he did not drink, but had taken "one line" the night before his appointment "for my pain for my hand."  AR 387-89.

Following plaintiff's testimony, vocational expert (VE) Gerald Belchick testified.  AR 392-408.  The ALJ began his examination of the VE by saying "[i]f, at any time, your opinions differ from anything in the DOT, please tell me."  AR 392.  The ALJ presented a hypothetical to the VE describing a claimant with the RFC for medium level work with the dominant upper extremity (arm and hand) "extremely limited" to occasional fingering but frequent handling with no forceful gripping, grasping or poking. The VE testified that he believed that such an individual could perform

11

United States District Court

For the Northern District of California

plaintiff's past work in retail sales.  AR 401.  After listening to a modified hypothetical in which the dominant hand was also limited to occasional handling, the VE testified that while the DOT specified "frequent" handling, jobs in retail sales would still be possible depending on what was being sold.  AR 401-02.  With both upper extremities limited to occasional handling, the VE testified, the retail sales jobs would no longer be possible.  Id.

When the ALJ asked whether, putting aside plaintiff's past relevant work, other jobs in the medium category would be possible with the same bilateral arm and hand limitations, the VE responded "that opens up a lot of categories."  Id.  Before taking further testimony on this point, the ALJ said "let's narrow it down further" and specified "required interaction with the public and co-workers [limited to] occasional."  Id.  The VE testified that night watchman jobs would meet these criteria but that cleaning offices at night might be precluded because of the use of upper extremities to sweep, empty wastepaper baskets and perform other such tasks.  AR 404.

On November 28, 2005, the ALJ rendered a decision adverse to plaintiff.  AR 16-26.  The ALJ found that plaintiff suffered from medically determinable impairments ("bilateral carpal tunnel syndrome, diabetes mellitus, an affective disorder and polysubstance abuse/dependence") that significantly limited plaintiff's ability to perform basic work activities and were therefore "severe" within the meaning of sections 404.15290(c) and 416.920(c).  Id.

The ALJ found insufficient medical findings to support a finding of listing-level neuropathy or diabetes mellitis as described in Part 404, Subpart P, Appendix 1.  Regarding mental impairments, the ALJ considered whether plaintiff's symptoms met or

United States District Court
For the Northern District of California

equaled the listings for affective disorder and/or for anxiety disorder (Part 404, Subpart P, Appendix 1, § 12.04 or 12.06) and found only mild or mild-moderate functional limitations in the relevant categories.  The ALJ noted that a listing-level substance abuse disorder (§ 12.09) could not be established without another listing level mental impairment.

        The ALJ reviewed plaintiff's medical records from the VA hospital, making particular note of any treatment for and references to depression as well as substance use.  AR 22-24.  The ALJ concluded that plaintiff's current RFC allowed him to perform his past relevant work as a retail salesperson, noting the VE's testimony that although "frequent handling" is required under the DOT's description of retail salesperson, no distinction is drawn between the upper extremities so that handling can be performed by "both extremities in combination."  AR 24.

        The ALJ made a finding that "while the claimant may be continuing to drink and use drugs, his alcohol and drug use do not interfere with his ability to obtain and maintain employment."  AR 24.  The ALJ found the credibility of plaintiff's statements alleging disability compromised by the inconsistency between plaintiff's actual, admitted activities and his alleged inability to use his hands for any activity due to pain, together with his lack of treatment for pain and the "inconsistent and contradictory statements to his physicians regarding his drug use." Id.

        The ALJ had to resolve conflicting reports about plaintiff's mental RFC by two consulting examining psychologists in order to conclude that plaintiff's impairments were not disabling. AR 21-24.  The ALJ gave weight to Dr Campagna's opinion that

13

United States District Court
For the Northern District of California

plaintiff's mental impairments did not prohibit him from working and rejected Dr Levine's contrary opinion.  AR 22-24.  The ALJ found that Dr Campagna's opinion was consistent with the opinions of treating physicians Ratnesar, Indermaur and Chung.  AR 23-24; see AR 204-18 (Dr Ratnesar noted situational depression in 2001 and anxiety in 2002), 267-74 (Dr Indermaur diagnosed plaintiff with a mild anxiety disorder and mild depression), 300-03 (Dr Chung found that plaintiff did not fulfill the criteria for depression or a generalized anxiety disorder).

The ALJ rejected Dr Levine's assessment that plaintiff was incapable of working because (1) Dr Levine was not a treating physician and (2) her opinion was based on plaintiff's self-reported symptoms and "admittedly questionable" test results.  AR 23.

After the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final decision of the SSA.  AR 6-8.  Plaintiff timely commenced the instant action seeking judicial review.  Doc #1.

II

The court's jurisdiction is limited to determining whether the SSA's denial of benefits is supported by substantial evidence in the administrative record.  42 USC § 405(g).  A district court may overturn a decision to deny benefits only if the decision is not supported by substantial evidence or if the decision is based on legal error.  See Andrews v Shalala, 53 F3d 1035, 1039 (9th Cir 1995); Magallanes v Bowen, 881 F2d 747, 750 (9th Cir 1989).  The Ninth Circuit defines "substantial evidence" as "more than a mere scintilla but less than a preponderance; it is such relevant

14

evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Andrews</u>, 53 F3d at 1039.  Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ.  See id; <u>Magallanes</u>, 881 F2d at 750.

"Disabled" is defined as "unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 CFR § 404.1527.

To determine whether a claimant is disabled and entitled to benefits, the SSA conducts a five-step sequential inquiry.  20 CFR § 404.1520; 20 CFR § 416.920.  At the first step, the ALJ considers whether the claimant is currently employed in substantial gainful activity.  If not, the second step examines whether the claimant has a "severe impairment" that significantly affects his or her ability to conduct basic work activities.  In step three, the ALJ determines whether the claimant has a condition which "meets" or "equals" the conditions outlined in the Listings of Impairments in Part 404, Subpart P, Appendix 1.  20 CFR § 404.1520.  If the claimant does not have such a condition, step four asks whether the claimant can perform his or her past relevant work.  If not, in step five, the ALJ considers whether the claimant has the ability to perform other work which exists in substantial numbers in the national economy.  20 CFR §§ 404.1520(b)-(f); §§ 416.920(b)-(f). Even if a claimant is found "disabled" under the five-step evaluation process in 20 CFR § 404.1520, the ALJ must find the claimant "not disabled" if the medical evidence indicates that drug

addiction and/or alcoholism materially contributed to the finding. <u>Parra v Astrue</u>, 481 F3d 742, 747 (9th Cir 2007).  The ALJ must determine which of the claimant's disabling limitations would remain if claimant stopped abusing drugs and alcohol.  20 CFR § 404.1535(b).  If the remaining limitations would not yield a disability finding, then the claimant's substance abuse is material and benefits must be denied.  Id.

III

Plaintiff challenges the ALJ's decision on two grounds. First, plaintiff argues that the ALJ premised his finding that plaintiff was capable of performing past relevant work on the incorrect Dictionary of Occupational Titles (DOT) description ⸺ specifically, that for "generic salesperson" rather than "shoe salesperson" ⸺ and, therefore, on a mismatch between the job demands ("frequent" handling) and plaintiff's RFC ("occasional" handling).  See Doc #12 at 15-18.  Second, plaintiff argues that the ALJ erroneously concluded that he did not suffer from a "severe" mental impairment; specifically, he argues that the ALJ's rejection of Dr Levine's evaluation was "specious."  Presumably, plaintiff believes that giving more weight to Dr Levine's findings would result in a determination that he is disabled.  See Doc #12 at 18-22.  The court finds no merit in either of these contentions.

A

Plaintiff argues that the ALJ erred in finding that he was capable of performing his past relevant work because that finding was premised on an incorrect Dictionary of Occupational Titles (DOT)

16

United States District Court<br>For the Northern District of California

United States District Court
For the Northern District of California

description.  See Doc #12 at 13-18.  Plaintiff argues that the characterization of his past relevant work as "retail sales" is incorrect because the bulk of plaintiff's work history is in shoe sales, a job which has a separate description in the DOT.  Doc #12 at 14.  Plaintiff points to the differing physical demands identified by the DOT of a general merchandise salesperson as compared with a shoe salesperson.  Doc #12 at 16-18.  Namely, plaintiff highlights the general merchandise salesperson requirement of "frequent handling" as compared with the shoe salesperson requirement of "constant handling."  Id; compare DOT 279.357-054 (general merchandise salesperson) with DOT 261.357-062 (shoe salesperson).  Had the ALJ performed the step four analysis using the correct DOT designation, plaintiff argues, a finding that plaintiff is disabled would have been mandatory because he cannot perform the constant handling demanded of a shoe salesperson.  AR 16-18.

The ALJ found that plaintiff's past relevant work was in retail sales.  AR 25; see DOT 279.357-054.  During the hearing, plaintiff testified that his work history consisted of retail experience in selling electronics and as a shoe salesperson.  AR 365-66, 373-74, 385-86 ("I've been in sales my whole lift [sic]." AR 374).  According to earnings reports included in the record, plaintiff worked at shoe stores and at electronics stores for the fifteen years prior to the alleged disability onset date.  AR 73-77, 84-85.  Those documents show plaintiff's work history in electronics sales at Fry's Electronics in 1994 and Sears Roebuck in 1996 and 1997.  AR 73-77, 84-85.  Plaintiff's work history in shoe sales includes employment at Montgomery Ward in 1995 and 1996, E&G

United States District Court

For the Northern District of California

Footworks in 1999, Boot Works in 2000, Foot Depot in 2000 and Beck's Shoes in 2000 and 2001.  Id.  There is also documentation of plaintiff's work in the automotive field, including income attributable to VJ Haavisto Enterprises in 1991, Earl Scheib of California in 1992, Shell in 1995, CSK Auto and Pep Boys in 1998 and Chevron in 2000 and 2001.  Id.  At the hearing the VE testified that plaintiff's work history was in "retail sales."  AR 392-93.  The VE explained that although the DOT creates separate categories of salespersons, such as shoe salesperson, retail sales is an overarching category that best describes plaintiff's varied work history.  Id.

The ALJ's decision to categorize plaintiff's relevant work experience as general merchandise sales, as defined by DOT 279.357-054, was supported by substantial evidence in the form of expert testimony, plaintiff's testimony and plaintiff's earnings records.  Describing plaintiff's past relevant work as "retail sales" was therefore not erroneous.

Plaintiff also asserts that the VE improperly deviated from the DOT description of the physical requirements of a retail salesperson.  Doc #12 at 16-18.  The VE testified that a person limited to occasional handling on his dominant side, but able to handle frequently on his non-dominant side, would still be able to function as a retail salesperson.  AR 401.  The VE explained this deviation from the DOT description by stating that the DOT definition of "frequent" handling did not differentiate bilaterally.  AR 400.  SSA policy interpretation rulings make clear that the adjudicator is required to ask a VE about any conflicts between his expert testimony and the information provided in the DOT.  See SSR

18

United States District Court
For the Northern District of California

00-4p.  The ALJ complied with this policy both at the outset of the hearing and during the VE's testimony.  See AR 392 ("If, at anytime [sic], your opinions differ from anything in the DOT, please tell me"); AR 400-01.  A VE may give testimony at variance with the DOT to rebut the DOT presumption of job classification, provided his testimony is supported by evidence in the record.  See <u>Johnson v Shalala</u>, 60 F3d 1428, 1435 (9th Cir 1995) ("although the DOT raises a presumption as to the job classification, it is rebuttable * * *. [A]n ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.").

In his decision denying plaintiff disability benefits, the ALJ explained his deference to the VE's deviation from the DOT: "The VE explained that although the DOT indicates that frequent handling is required, no distinction is drawn between the upper extremities; in his view, as long as handling can be performed frequently by both extremities in combination, the job can be performed."  AR 24.  The medical evidence in the record supports this conclusion; plaintiff has only received treatment for pain related to carpal tunnel syndrome in his right hand.  See AR 205-08, 211, 258, 266, 311-14, 337-39.  The medical records, in combination with the VE's testimony in support of his variance from the DOT description, constitute substantial evidence upon which the ALJ properly relied.

Even if the court were to find that the ALJ erred in his step four determination, the error would be harmless.  Plaintiff could not pass the fifth step of the disability determination because he is capable, according to the testimony of the VE, of performing many other kinds of work outside his past work experience

19

that exist in significant numbers in the national economy.  See 20
CFR § 404.1520, 416.920.  In particular, the VE testified that
plaintiff would be able to work as a night watchman.  AR 403.
Plaintiff does not directly challenge the finding that he is capable
of medium work.  According to SSA regulation, "[t]he functional
capacity to perform medium work represents such substantial work
capability at even the unskilled level that a finding of disabled is
ordinarily not warranted in cases where a severely impaired
individual retains the functional capacity to perform medium work."
20 CFR Pt 404, Subpart P, App 2 § 203.00(b).  Plaintiff does not
fall into the category of claimants who, although capable of medium
work, are found to be disabled:  he has education beyond high school
and his past work experience is not arduous physical labor.  Id.

        The ALJ's characterization of plaintiff's relevant work
experience as "retail sales" was not in error, and the deviation
from the DOT description of that occupation's physical demands was
supported by VE testimony and the medical record.  Plaintiff's
argument is also unavailing because plaintiff cannot prevail at the
fifth step of the disability analysis since he is capable of
performing other work.

                                B

        Plaintiff next contends that the ALJ erroneously concluded
that he does not suffer from a severe mental impairment.  See Doc
#12 at 18-22.  This argument implicates both the step two severity
inquiry and the step four RFC inquiry.

        The step two severity inquiry is a de minimis screening
device designed to identify and eliminate claims based on medical

United States District Court

For the Northern District of California

impairments so slight that a disability finding is unlikely.  See Bowen v Yuckert, 482 US 137, 153 (1987).  If the claimant suffers from a combination of impairments, the combined effect of all impairments will be considered "without regard to whether any such impairment, if considered separately, would be of sufficient severity."  42 USC § 423(d)(2)(B); 20 CFR § 404.1523.  If the claimant has "a medically severe combination of impairments, the combined effect of the impairments will be considered throughout the evaluation process."  Id.  The ALJ concluded that the combination of plaintiff's impairments (carpal tunnel syndrome, brittle diabetes mellitus, an affective disorder and polysubstance abuse/dependance) were severe.  Id.  The ALJ did not make a separate severity determination with respect to plaintiff's mental impairments but rather considered his impairments in combination throughout the disability determination process, consistent with 20 CFR sections 404.1523 and 416.923.  Accordingly, at step four, the ALJ considered the combined effect of plaintiff's impairments, concluding that he was able to perform medium work and therefore was not disabled within the meaning of the Act.  AR 21.

        The ALJ's resolution of conflicting medical reports is entitled to deference.  See Magallanes v Bowen, 881 F2d 747, 750 (9th Cir 1989).  Because Dr Levine's assessment was based on plaintiff's discounted claims, the ALJ had discretion to reject it.  See Sandgathe v Chater, 108 F3d 978, 980 (9th Cir 1997).  This is especially true here given that plaintiff's misstatements to Dr Levine about his drug use are manifest from review of the document in question combined with other medical information in the record.  Also, Dr Levine's conclusion that plaintiff was incapable of

United States District Court
For the Northern District of California

successful employment "for the next 12 months" appears to run afoul
of 20 CFR § 404.1527(e), which reserves to the SSA the determination
that a claimant is disabled.

Plaintiff's challenge to the ALJ's handling of his mental
health claim is baffling given that the record makes obvious that
plaintiff is an unrepentant, chronic user of substances such as
methamphetamine that are known to cause the very symptoms he
complains of, including anxiety, insomnia, paranoia and "out-of-
control rages." Http://www.usdoj.gov/dea/concern/meth.html
consulted July 9, 2008. Plaintiff's manifest lack of candor with
health care providers, examining physicians and the SSA about the
extent and timing of his substance abuse make the true state of his
mental health impossible to determine. But the burden is on a
social security claimant "to furnish medical and other evidence that
we can use to reach conclusions about your medical impairment(s)
and, if material to the determination of whether you are blind or
disabled, its effect on your ability to work * * *." 20 CFR §
404.1512(a), § 416.920(a).

Plaintiff, moreover, refused treatment for his mental
health problems. The social security regulations provide that "in
order to get benefits, you must follow treatment prescribed by your
physician if this treatment can restore your ability to work." 20
CFR § 404.1530, § 416.920. Plaintiff did not comply with drug
testing required by the VA psychiatry program and actively rejected
referrals to drug treatment that VA psychiatrists had determined he
needed. There is no indication in the record that plaintiff ever
acknowledged his drug use as a problem or sought treatment for it.
\\

United States District Court
For the Northern District of California

1    And finally, the court considers it doubtful that, if this

2  matter were remanded, plaintiff's claim for benefits would withstand

3  the drug and alcoholism analysis that would inevitably follow the

4  five-step analysis in the unlikely event that the SSA found him

5  disabled at step five.  See 20 CFR § 404.1535(b) and 416.935(b)

6  Plaintiff appears to be precisely the sort of disability claimant

7  that Congress intended to bar from receiving benefits when it

8  enacted, in 1996, 42 USC § 423(d)(2)(C) which was intended "to

9  discourage alcohol and drug abuse, or at least not to encourage it

10 with a permanent government subsidy." Parra, 481 F3d at 747.

11

12                                  IV

13         The ALJ's determination that plaintiff is capable of

14 medium work and therefore not disabled within the meaning of the Act

15 is supported by substantial evidence in the record and free of legal

16 error.  42 USC § 405(g).  Plaintiff's motion for summary judgment is

17 DENIED and defendant's motion for summary judgment is GRANTED.

18         The clerk is directed to enter judgment in favor of the

19 defendant and to close the file.

20

21         IT IS SO ORDERED.

22

23  _____

24  VAUGHN R WALKER
    United States District Chief Judge

25

26

27

28

                                  23